All right, good morning, your honors. My name is Tom Coonley, and I represent Appellant Boston Scientific Corporation. And with permission of the court, I'd like to reserve two minutes. May it please the court, Boston Scientific seeks review of three issues in this matter. First, whether Mr. Masters' departure at age 59 was a retirement, as defined in the stock option agreements. Second, whether Mr. Masters timely filed this action. And third, whether the amount of damages is supported by law and evidence. Starting with the definition of retirement, it's Boston Scientific's contention that retirement, as used in the stock option agreements, meant age 62. The district court held to the contrary in its motion for summary judgment. It held that retirement meant rule of 62, which takes into account years of service and the age of the potential or putative retiree. There was no hearing on the summary judgment motion. Indeed, it was Boston Scientific who was the moving party. The motion was not just denied, but rather the court, sua sponte, decided on its own that Boston Scientific was liable under the contract, and that the statute of limitations and damages would be the only issues at trial. And in fact, any evidence about the construction of the contract was expressly barred by the district court. Now, the contract — But you took that risk when you filed your motion for summary judgment, right? Pardon? You took that risk when you filed your motion for summary judgment. There's nothing improper with it. You're not contending the district court procedurally committed any procedural error in granting summary judgment against you. I'm not, Your Honor. Yeah. Now, the contracts we contend were unambiguous, but not in the way the district court so held. Well, if they're unambiguous, I was just wondering, what would happen other than summary judgment, because it seems that construing a contract is going to be a legal issue, and it's hard to see what would happen at a trial regarding the intent of the parties. Obviously, Masters had no intent, and it seems like the company didn't know what its language said either, because they offered several different interpretations during the course of the period. So isn't this just a pure legal issue before us? Why would summary judgment be inappropriate? Well, we have two responses to that. First, we do think this is a legal issue and that the Court simply got it wrong. But secondly, if the language is found to be ambiguous, there is evidence that would bear on its meaning in two ways. One would be the fact that there was a course of conduct. The same definition of retirement that was in the stock option agreement was also in the 92 and 95 plans. And in those plans, Mr. Masters received stock options and went ahead and exercised them under those plans. And so both Boston Scientific and Mr. Masters understood that the exact same definition at issue here was in prior plans and meant age 62. Now, also, if there's ambiguity found, or whether or not there's ambiguity found, there's the issue of mutual mistake. And if both parties believed that the retirement age was age 62 as they departed their ways in January of 2001, then we do have an issue that if they both intended the agreement to mean age 62, that then the contract should be reformed and should be meant age 62 as the definition of retirement. The, as I said at the beginning of that, it is a matter of law, we believe, because we think the contracts are unambiguous. The 2000 plan allowed any definition of retirement as long as it was expressly stated and as long as it was approved by the administrator. The administrator approved the stock option agreements, and they included their own definition of retirement. Retirement was capitalized, in quotes, in the agreement. And the definition of retirement in the stock option agreements said, well, we have a normal retirement date in the pension or deferred comp plans, and there was no dispute that there was no pension plan and the only deferred comp plan was a 401K plan, which had a normal retirement date of age 62. All of that is uncontested. The other definition was an early retirement date, so specified. And in that regard, the option agreements, the deferred comp, the pension agreement, there's only one place to look there, and it was the 401K agreement. There was no early retirement age there. And Mr. Masters contends in his brief that it must have referred back to the 2000 plan, that the agreements issued under the 2000 plan then cross-referenced back up to the 2000 plan, but there's no early retirement there either. And so if you look at the definition of retirement, it can mean one thing and only one thing, and that is the retirement means age 62, and all those facts are undisputed. Let me now turn to the statute of limitations. It's Boston Scientific's contention that this action was time-barred, and this issue reveals the inconsistencies in the district court's rulings. In the context of contract construction, the district court found the word retirement to mean rule of 62 unambiguously. But in the context of the statute of limitations, that same conclusion became inherently unknowable. Okay, so the starting point on the statute of limitations is the undisputed fact that more than six years passed between the January 2001 departure of Mr. Masters and the filing of his action in May 2007. So now Mr. Masters has the burden of proving some form of tolling. Now three facts are important in that regard. First, that Mr. Masters can't remember one way or the other whether he received a copy of the 2000 plan. Now it was Boston Scientific's practice, and this is in the record, that in order to comply with the Securities and Exchange Commission requirements, it mailed the plan, along with the stock option agreements, the stock option agreements which Mr. Masters signed. Could a contract ever – could the discovery rule ever run on a contract? Under what circumstances would it be? I mean, the theory here is that given the complexity of the agreements in the 2000 long-term – what was it – incentive plan, that it's just for an ordinary person to figure out what the retirement age was was just too hard. And so until he actually discovered this ambiguity or inconsistency, the statute wouldn't start running. And your argument is, well, at least in this case, the plan was knowable. He had a copy of it. He should have known. Well, are there ever any circumstances where the discovery rule would not – would cause the statute not to start running until he understood the nature of these interlocking contracts, in your view? So let me start by answering your question by saying that Massachusetts law is remarkably uncompromising in this area. It says that if you get a copy but you don't read it, and in fact, even if you can't read, you're bound to it. It says that when contracts are incorporated by reference into another contract, that you're charged with the knowledge of that document. And third, it says that if the document at issue that's referenced in the agreement is publicly available, then that, too, you're charged with the knowledge of it. So in this case, there are three reasons why Mr. Masters should have known the content of the 2000 plan, and he was charged with that. And so I think that the discovery rule could apply, for example, if he had a discovery rule, and there was actions to hide it from him, there was no other way to get it, but I don't think that misunderstanding the contract or not attempting to understand it is a valid ground under Massachusetts law to invoke the discovery rule. And in fact, and this goes back to the facts, Mr. Masters in 2007 started scratching his head and saying, what does this 2000 plan mean? And his testimony at trial was, well, I looked at the 2000 plan, I consulted with a lawyer, and I determined that the rule of 62 should apply. And so this was not a situation where he had no ability to understand the 2000 plan. In fact, he did so, he just did so too late. Does it make a difference under Massachusetts law if the company says, don't worry, we'll tell you what the contract means and then provide some misinformation? I don't know the law on that point, but that didn't happen here. When Mr. Masters departed in 2001, his trial testimony was, nobody told me anything. And in 2005, he takes the position that this letter that he received said, well, the age 62 date for retirement applied to certain options that were issued well beforehand. Well, that didn't change his view on those options one way or the other. And he couldn't reasonably rely on it, of course, because he's charged with knowledge of the contract back when he signed it in 2000 and 2001. He then cites confusion in 2007, and there was confusion in 2007. But it was after the statute of limitations had run. It's immaterial to the analysis of estoppel or the discovery rule, because at that point, it was just too late. Let me now turn to damages. It's Boston Scientific's contention that the damages that were awarded to Mr. Masters are not supported by the evidence, and there are three points we want to make in that regard. First, Mr. Masters wrote in his brief that he should, quote, be put back in the same position that he was before the breach. And we agree, and the law so states. It is proper to value the options that he claims were allegedly taken away from him properly on the date of the breach, which was January 12, 2001. Second, both experts used the Black-Scholes model to determine the value of the stock options at the time of breach. Now, the Black-Scholes model, two people got a Nobel Prize for it, actually three, I think, and the third person never got his name attached to the model, unfortunately. But that model takes into account the volatility of the stock price, the interest rate, the expiration date of the options, and some other variables. Okay. I just want to ask you something. Sure. I think on the day he retired, the stock was underwater. Is that the term? No. Some of it was, and some of it was not. Oh, okay. And then this model, it's not taking the stock value on that day. It works in all those other terms to give some value on that day, even though that doesn't reflect the stock prices on that day. Yes. So it somehow builds in some future value. That's right. And so I spoke about the data inputs into the model, and then it uses formulas that take pages and pages to go through to take into account, and this is the important thing, the expected future changes of the price and human behavior in terms of how they exercise. The stock, if this is the present, the stock is going up and down, and that volatility is reflected in the formula. There's the breach. And then you know, based on this vast information, the stock's going to continue to be variable, and people are going to exercise it when it's more up than down. And so based on that, the Black-Scholes model takes into account the data from the past and the conduct in the future. Now, just to elaborate on... That's what you guys, your side, didn't want the Black-Scholes model. You wanted some downward adjustment because you thought this was illiquid. Now, we agreed with the valuation on Black-Scholes, and the actual value, going back to your question earlier, and just to clarify, the value of the stock options when he was at $25,000, the Black-Scholes model concluded that it was $79,000, and we don't contest that point. That fact that it was worth $79,000 is illuminated by the question and answer that was given by Masters' expert at trial. Quote, if you were sitting here telling Judge Ware on the 13th of January, 2001, what Mr. Masters had been deprived of in terms of dollars, what number would that be? And Mr. Masters' expert said, on that day, on the date of breach, it would be the $79,000 number. Now, I just want to briefly say that the judge in the district court concluded that, well, we'll start with that number and then we'll add $200,000, and we can find no factual support for that number. He cited human behavior, but more importantly, it double counts what the Black-Scholes model has already done. The Black-Scholes model has taken into account the future stock price going up and down. It's discounted it to the present, and so it's already been accounted for. So with that, I'll sit down. Good morning, Your Honors. My name is Greg Cavallo of Shop-Off and Cavallo. I'm here on behalf of the appellee, Donald Masters. I think I'm going to take this in reverse order. I'm going to start with the damages in this case. There were a variety of misstatements here about what happened at the trial on this, and the damages are key here. Black-Scholes does not take into account future value. The idea that Black-Scholes double counts future value is utterly incorrect. Black-Scholes takes the current stock price, so any day you run it, you take the stock price, based on the past fluctuation, not even how high it went or how low it went. It's just the fluctuation of the stock. It's called the beta. That fluctuation of the stock in the past is then used to extrapolate kind of a straight-line stock increase in the future. It's always an increase. Stocks are always presumed to increase in the future because the idea is that if they weren't going to increase, you would pay less for them now. That's the whole present value-future value analysis. The Black-Scholes, though, doesn't know the future. The Black-Scholes just knows the past. It takes the past. It takes the interest rate. And Boston Scientific here today has taken the position that it also takes into account the exercise of the options and what people are likely to do. That is utterly false. The Black-Scholes is a purely mathematical model that takes into account the current stock price, the beta, the interest rates, and only one thing, the expiration date. The dates in the middle of the options are in the middle between the issue date and the expiration date are utterly irrelevant to the mathematical determination of the value of the option. And I started with this because this brings me to a key point about the damages. At the trial, I asked Boston Scientific's experts. I said, if Mr. Masters walked into your office the day he got these options and said, hey, I've got these options today that were given to me by Boston Scientific, here's what they are. He lays them on the table. They've got expiration dates in the future, three years from the day he's in his office. And I said, and Mr. Masters says, when should I exercise these options? What principle should I have? What should I do? I asked their expert that question, and he said the last day of the option period. The reason is that mathematically you never exercise options before the last day of the option period. In fact, if you look at European options versus American options, American options are at issue here. You could exercise those at any time. European options you can only exercise at the last date. European options and American options have the exact same value under the Black-Scholes and any other kind of mathematical analysis. So why did Mr. Kirk come up with the 200,000? I don't understand that. Well, I'm not sure I understand the 200,000 either. But the notion is that our expert actually came on the stand and said he looked at — he didn't look at the future. He took every day of the option period, and he made a human analysis. He based it on studies of executives, which Mr. Masters was not. Mr. Masters is an engineer his whole life. He's not an executive plane engineer or an engineer plane. He's an engineer. And they said — but he based on these studies, and he said on certain days, people based on the increase of the stock price are more or less likely to sell their options. And he came up with a conservative time and a moderate time and an optimal time. And he testified that all of this — these studies and the data, Boston Scientific ignored. Their expert did nothing like that. So if we go back to that, he actually made an evaluation of a conservative number. The conservative value of these options was that on the exercise date was 477. So when these options — Right. But, again, where did the district court come up with this number? Where did — what, the 200? Yeah. Well, I'll give you that. The district court was trying to do what a district court does. It's estimating damages. It's estimating damages. It says, hey, I don't think we can exactly rely — I don't think I can — I feel good relying on this exact kind of formulation by the plaintiff's expert. At the same time, the Black-Scholes utterly fails to take into account the increase of the stock price. Boston Scientific gets a windfall if the Black-Scholes method is the only method used. The Black-Scholes — this stock could have gone down to zero. I think you're missing my point. I'm trying to find out. You can't — the district court just can't throw a dart at the board or average them in this kind of case. It has to have some evidentiary support. You say we have plenty of evidence that shows that these stock options are worth more. Your opponent says, well, no, they're worth a lot less. What the district court looks to me to do is just pick a number out of the air. Isn't that basically what happened? Well, I think — I think the court estimated. The court did something like that. I can't — you know, you can read the transcript like I did, and I'm not in Judge Ware's head, but I think that he thought that something less than the conservative was required by the evidence, and so that he took an estimate. He took an average. He did something like that. He took 79. He took 477. He took a number in the middle and said 277. I mean — I'm sorry. He said 279. Now, again, I'm not in his head. I can't really — I can't tell you any more than his ruling says, but what I'm trying to say is it's within his discretion. He's the trier of fact, not unlike a jury, not unlike — he's tasked with giving a damages amount, and judges are allowed to estimate damages. There's plenty of case on this. As long as it's — the fact of the damage isn't estimated, the amount can be estimated. And that's in the Wayne Associates-Lussier case. It's also talked about in detail in the Scully v. U.S. Watts case, which are the best two damages cases on point on this case. And I understand the 200. If you want to say pull out of the hat, maybe that's what he did. And what's the difference between that and 250 or the justification of 175? There's no — there's no principled reason to pick 200 except you're just trying to average things out and be fair, I guess. Well, I think — I think you can say that, and maybe that's what he was doing. I personally think he was trying to do a compromise to avoid this exact situation. But if it is sent back, if the court is going to send this back for damage determination, it should be reopened completely. And if — if then he should be getting the optimal amount, the 870. If — what I disagree with here is the reason I didn't cross-appeal this is I don't think there's any clear error here. I agree with what you said, that it's not exactly — it's an estimate or it's pulled out of the hat or whatever, but he had our number. He had the 890 number, which was the exercise at the end of the option period. He had the 79 Black-Scholes, you know, bottom basement number, which doesn't take into account the future increase in the price. And if Boston Scientific go back and buy out all their options at the Black-Scholes price, they'd be happy to do so. That's a windfall for Boston Scientific. He was trying to avoid that, but he was also trying to fashion something that took something else into account. And I think that's what he was trying to do. And I don't think it's clear error. Your time is running down, so I want to make sure you get to your other issues. Why don't we talk about statute of limitations for a minute? Why isn't the SEC filing enough to trigger constructive notice? Well, Boston Scientific cites repeatedly the concept of constructive knowledge as a basis to wipe out the discovery rule. There simply isn't any citation by Boston Scientific, nor is there any case that says you can't apply the discovery rule, you can't apply equitable tolling on the basis of an ununderstood contract claim. And I think that the lower court, when it saw the evidence, it looked at all the facts, it looked at the sequence of events here, it determined, I think rightfully so, this was completely unknowable to almost anybody. So opposing counsel cites Massachusetts law that says you're charged with knowing the contents of a contract. And my understanding is that it's not disputed, maybe you can correct me, that Mr. Masters had the 2000 plan that had the additional language. So why is the Massachusetts law not applicable here? Well, the idea that Massachusetts law is special is wrong. All Boston Scientific is citing is the principle that you're bound to a contract that you've signed, even if you don't understand. That's constructive knowledge. There's nothing in there about that eviscerating the discovery rule. Of course, Mr. Masters is bound to the contracts. We never disputed that. The notion is that whether he's charged with understanding it pursuant to the discovery rule, and there's no case that says that's not allowed, the discovery rule is set up for to avoid fundamental unfairness when someone doesn't know or can't know, and based on all the facts, Judge Ware found that he could not have understood this, he could not have known. So are you saying if somebody signs a contract, say they buy a house and they sign the purchase and sale agreement, that at some later time they could say, well, I didn't actually read it, and I didn't know what the contents are, and now I've discovered it, so I've discovered my cause of action, so the statute would start running at that point? I think of certain facts that might be allowable under Massachusetts law and the discovery rule. It's just a statute limitation. It's not a dispositive get you out of the contract. But let me – I know my time is getting lower. I want to take that to the next step, and that's even if you presume constructive knowledge here, that doesn't get Boston Scientific out of this. Boston Scientific also has constructive knowledge of the same contracts. If you assume the 2000 long-term incentive plan was known to Mr. Masters, it was also known to Boston Scientific. On January – in January of 2005, Boston Scientific, with the same constructive knowledge that Mr. Masters had, sent a letter to Don Masters, and it said, plan the – the 2000 long-term incentive plan provided a retirement date of age 62 for options issued prior to May 2001. That is a completely false statement.      It's a false statement. But it requires that you know what options are required by you. And so – I thought your client testified that it didn't change his mind about what he thought. He didn't know he had a claim and after that letter, he didn't know he had a claim. But the fact is – Yes. He didn't know he had a claim so that letter doesn't do anything. It does something. And it does something because he didn't know about the claim. Even if he – but you have to assume he's sitting on these claims. He had constructive knowledge. He's sitting on them. So he waits four years. He gets this letter. These agreements are obviously confusing. And it says right on it, plan, the 2000 plan, states an age 62. Now, here's why that's a – Here's what happens. If he said, I didn't know it was going on, but – and I was thinking of looking into it further. But I got that letter and that made me not look into it anymore. Maybe that's a different case. But that's not what happens here. So the fact that it was so confusing that no normal human can understand it somehow makes it so their letter is without effect. That's not fair to him either. No. I mean, I think the question is what evidence in the record that shows detrimental reliance on the letter? I understand that the letter was received, but – But if you're charging him with knowledge, that means he knows. He's sitting on this claim. So you also have to presume that he would have read the letter and it has a direct statement that contradicts the material fact that makes his claim. And let me add something else. No, you have to – not only do you have to have a representation, but you have to have detrimental reliance. What you're saying is the representation alone is enough to be fraudulent concealment or some other exception to statute of limitations. But unless you can correct me, I don't see anything in this record saying, I didn't file suit, I didn't see a lawyer because I relied on this letter. No. He didn't see a lawyer because he relied on Boston Scientific as the administrator of this plan to follow its own agreements and do things fairly. He – the judge found he was entitled to reliance. So when they canceled those options, he relied on their expertise. When he got the letter, sure, it did not – it didn't affect him because he didn't know about his claim. But if you're charging him with knowledge, then it would have. You've got to look at it that way. Otherwise, the fact that they made it so confusing – The two constructive knowledge and – I mean, the two concepts. Let me talk more about constructive knowledge. I mean, there's some – Just don't worry. I mean, you do have an SEC filing. It's on record somewhere, and I realize that it can't be, in a sense, in the common sense world, expected to do that. But in the legal sense, people do charge people with knowledge of public filings. So I think that's out there. If that's true, then there's two other points. One is the letter would have eviscerated that suspicion. And the second is there are things outside these contracts that you have to know to interpret them. He could have constructive knowledge of the 2000 plan. He could have knowledge of the stock option agreement he signed. But without knowing that the 401k is the only deferred compensation plan, that there is no general – generally applied pension plan, without knowing that fact, he couldn't possibly interpret the contracts. So you not just have to look outside – don't just look at the contracts to understand their position. You have to look outside. And there's nothing here that shows that there's no evidence and there's no facts establishing that Mr. Masters could possibly have known how to interpret that clause of the stock option agreement. It's nonsensical, and it's completely based on Boston Scientific's own, like, general counsel's view that there are no other this, so it has to be the 401k plan, and therefore it has to be 62. That – and the early retirement date, there isn't one in the 401k, that's all outside these agreements that he's charged with having constructive knowledge of. And it's not just, you know, you can have constructive knowledge of a document, but the fact in that retirement definition in the agreement itself is not constructive knowledge. He couldn't have known, you know, he couldn't have possibly known what the deferred compensation plans were, so he couldn't possibly have constructed the agreement. But isn't that the difference between constructive knowledge and actual knowledge? I mean, that's the – I think you've just defined it. I mean, the constructive knowledge is you presume that's – the law presumes that someone knows something. They don't have to actually know. What you're arguing, it seems to me, is that he didn't know it, and I accept you. But that's a different concept from constructive knowledge. It's not that he just didn't know it. It's that he couldn't have known it constructively either. There is no constructive knowledge of their interpretation of the stock option agreement. Boston Scientific gives this technical explanation that the deferred compensation plan can only be the 401K. If he knew that, if he had somehow constructive knowledge of that, which there's no evidence he could possibly have constructive knowledge of that, without that, there can't be constructive knowledge of his claim. So not only did they not tell him what they were doing, they didn't follow their own agreements, they sent him a letter telling him not to worry about it, and he couldn't – even if he's tasked with constructive knowledge, he couldn't have understood his claim. It's impossible, and that's what Judge Ware found. Thank you, counsel. I just want to make four very brief points. My first point is that the district court found there was no fiduciary duty between Boston Scientific and Mr. Masters with respect to the stock options. And so we heard opposing counsel say, well, they should have told him or he trusted them. The district court found there was no obligation to do so. There was no fiduciary duty. Secondly, a question was raised about the public policy implications of people not understanding contracts and having that be an excuse for not timely filing actions. I'll tell you, I read software licenses from time to time. They're all really hard. There are a lot of contracts out there that are hard to understand, but under Massachusetts law, you're charged with understanding the contracts, A, if you don't read them even, and B, even if you can't read. And so Massachusetts law is just uncompromising in that respect. We haven't given up on actual knowledge. Mr. Masters testified that he may or may not have received a copy of the 2000 plan. We've been talking about presumptive knowledge and constructive. We think we went on that. But the cover letter, Exhibit 17, says enclosed are two copies of the stock option agreement. This is the cover letter to those agreements which he signed. And it says your options are granted under the long-term plan. If you need more information about the plan, please call and they give you information. But most importantly, also enclosed are a copy of the plan, the stock option exercise booklet, and other stock option exercise information. And so we think, and we had testimony from our side that it was the practice of Boston Scientific to comply with the SEC regulations that require companies to give the plan when they issue the stock option agreements. Thank you, Counsel. The case is heard, will be submitted for decision, and we'll be in recess for the morning. All rise.
judges: Restani, Thomas, Ikuta